```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF OHIO
                       EASTERN DIVISION
```

United States of America

    v.                                Case No. 2:18-cr-229-1

Clint J. Green

## OPINION AND ORDER

Defendant was charged by information with one count of engaging in a health care fraud scheme in violation of 18 U.S.C. §1347, and one count of filing false tax returns in violation of 26 U.S.C. §7206(1).  Defendant and the government entered into a plea agreement pursuant to Fed. R. Crim. P. 11(c)(1)(C), which called for a binding sentence of 42 months.  By judgment entered on June 10, 2019, defendant was sentenced to terms of incarceration of 42 months on Counts 1 and 2, to run concurrently.  Defendant was sentenced to a three-year term of supervised release on Count 1 and a one-year term of supervised release on Count 2, to run concurrently.  Defendant was also ordered to pay restitution in the amount of $3,385,457.41.

The website for the Bureau of Prisons ("BOP") reports that defendant's projected release date is July 2, 2021.[1]  See https://www.bop.gov/inmateloc/.  However, defendant and the government have indicated that the BOP plans to release defendant on home confinement on August 25, 2020, pursuant to the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), §12003(b)(2),

---

[1] Defendant has only served approximately one year of his 42-month sentence.  The court assumes that this release date takes into account anticipated good time credit under 18 U.S.C. §3624(b) and the one-year sentence reduction which can be awarded under 18 U.S.C. §3621(e)(2)(B) based on the completion of a residential drug treatment program.

and the Attorney General's declaration, which authorize the BOP director to grant home confinement sooner than would otherwise be allowed under 18 U.S.C. §3624(c). The record also includes a document referring defendant for CCC (community corrections center) placement. This document recommended releasing defendant to a CCC on August 21, 2020, in the event that defendant was not approved for direct home confinement under the Second Chance Act. Doc. 64-2, pp. 1-2.

On May 19, 2020, defendant filed a motion to reduce sentence pursuant to 18 U.S.C. §3582(c)(1)(A), as amended by the First Step Act of 2018, relying primarily on the risks posed by the COVID-19 pandemic. Doc. 61. The government filed a response in opposition to the motion. See Doc. 64. Defendant filed a reply to the government's response. See Doc. 65. Defendant also filed motions for leave to file supplemental memoranda instanter. The motions for leave to file instanter (Docs. 66 and 67) are granted.

I. Exhaustion of Administrative Remedies

Under §3582(c)(1)(A), the court may reduce a sentence of imprisonment upon motion of a defendant after that defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to file such a motion on a defendant's behalf, or after thirty days have passed since the warden's receipt of defendant's request. This exhaustion requirement is not jurisdictional, but is a mandatory condition which must be enforced if the government timely objects to the failure to exhaust. United States v. Alam, 960 F.3d 831, 833-834 (6th Cir. June 2, 2020).

The record includes defendant's request for release on home confinement. Defendant stated that he suffers from medical

conditions that could be exacerbated by COVID-19. Doc. 64-3, pp. 6-10. On April 6, 2020, defendant was informed that his April 3, 2020, request had been reviewed, but that he was required to submit a release plan. Doc. 64-3, p. 5. On April 8, 2020, defendant submitted a proposed release plan and repeated his request for release on home confinement to reduce his risk of contracting COVID-19. Doc. 64-3, p. 1-3.

On April 24, 2020, the warden responded to defendant's April 8, 2020, request for a reduction in sentence due to COVID-19. Doc. 64-1, Ex. A, p. 1. The warden concluded that defendant's concerns about the spread and effects of the virus did not currently warrant his early release. The warden informed defendant that if he was not satisfied with the response, he could commence an appeal of this decision via the administrative remedy process by submitting his concerns on the appropriate form (BP-9) within twenty days of his receipt of the response. The government indicated that it is unaware of whether defendant filed an administrative appeal. Doc. 64, p. 2. However, the government did not specifically argue that defendant failed to exhaust his administrative remedies; rather, the government addressed the motion on the merits. This court will likewise address defendant's motion on the merits.

II. Standards for Release under §3582(c)(1)(A)

A. In General

The court can reduce a sentence under §3582(c)(1)(A) if the court finds that "extraordinary and compelling reasons warrant such a reduction[.]" 18 U.S.C. §3582(c)(1)(A)(i). In order to determine that extraordinary and compelling reasons exist, the court must find "that such a reduction is consistent with applicable policy

statements issued by the Sentencing Commission[.]" 18 U.S.C. §3582(c)(1)(A). If the court finds that extraordinary and compelling reasons for release have been shown, the court must then consider the factors set forth in 18 U.S.C. §3553(a) to the extent that they are applicable. §3582(c)(1)(A). If the court decides that the motion is well taken after weighing the statutory sentencing factors, the court "may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment)[.]" §3582(c)(1)(A). The grant of compassionate release is at the discretion of the court. United States v. Kincaid, 802 F. App'x 187, 188 (6th Cir. 2020).

B. Sentencing Commission Policy Statement

The Sentencing Commission has issued a policy statement regarding the reduction of a term of imprisonment under §3582(c)(1)(A). See United States Sentencing Guidelines ("U.S.S.G.") §1B1.13. Under §1B1.13, a reduction may be ordered if extraordinary and compelling reasons warrant a reduction, the defendant is not a danger to the safety of any other person or to the community, and the reduction is consistent with the policy statement. §1B1.13(1)(A), (2) and (3).

Under Commentary Note 1(A) to §1B1.13, extraordinary and compelling reasons exist where: (i) the defendant is suffering from a terminal illness, that is, a serious and advanced illness with an end of life trajectory; or (ii) is suffering from a serious physical or medical condition, a functional or cognitive impairment, or deteriorating physical or mental health because of the aging process that substantially diminishes the defendant's ability to provide

4

self-care within the environment of a correctional facility and from which he is not expected to recover. U.S.S.G. §1B1.13 cmt. n. 1(A).

Commentary Note 1(B) to §1B1.13 states that extraordinary and compelling reasons exist when the defendant is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process, and has served at least 10 years or 75 percent of his sentence, whichever is less. U.S.S.G. §1B1.13 cmt. n. 1(B). Under Commentary Note 1(C), family circumstances can constitute grounds for a reduction, specifically: (i) the death or incapacitation of the caregiver of the defendant's minor child or minor children, and (ii) the incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner. U.S.S.G. §1B1.13 cmt. n. 1(C). Neither of these considerations are applicable in this case.

Commentary Note 1(D) states that other reasons for a reduction of sentence may be shown when, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. §1B1.13 cmt. n. 1(D).

As to Note 1(D), the BOP has issued Program Statement No. 5050.50, <u>Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)</u> (Jan. 17, 2019), https://www.bop.gov/policy/progstat/5050_050_EN.pdf, which lists factors which the BOP uses in determining whether extraordinary and compelling reasons exist for compassionate release. Program Statement No. 5050.50 authorizes the filing of a request for a

5

sentence reduction for reasons which are substantially similar to those outlined in Commentary Note 1(A)-(C) of §1B1.13. The Program Statement addresses requests for a reduction in sentence based on: a terminal medical condition with a life expectancy of 18 months or less or an end-of-life trajectory, see Section 3(a); or a debilitated medical condition due to an incurable progressive illness or debilitating injury from which they will not recover, see Section 3(b). Section 4 authorizes a reduction for inmates age 70 or older who have served 30 years or more, see Section 4(a), inmates age 65 or older who suffer from certain medical conditions and who have served at least 50 percent of their sentence, see Section 4(b), and inmates age 65 or older who have served the greater of 10 years of 75 percent of the term of imprisonment, see Section 4(c). Section 5 permits consideration of a reduction in sentence request based upon the death or incapacitation of the family member caregiver of an inmate's child under the age of 18. Section 6 authorizes the filing of a request based on the incapacitation of an inmate's spouse or registered partner when the inmate would be the only available caregiver for the spouse or registered partner.

Because the Guidelines have not been amended since the enactment of the First Step Act due to the lack of a quorum on the Sentencing Commission, some courts have concluded that district courts also have the authority under Commentary Note 1(D) to determine if other extraordinary and compelling reasons exist, and that the Director's prior interpretation of "extraordinary and compelling reasons" is informative but not dispositive. See, e.g., United States v. Cantu, 423 F.Supp.3d 345, 350-352 (S.D. Tex. 2019); United States v. Brown, 411 F.Supp.3d 446, 449-451 (S.D. Iowa 2019).

However, other courts have concluded that Application Note 1(D) continues to apply, and that the court must look to the reasons recognized by the Director of the BOP. See, e.g., United States v. Saldana, 807 F. App'x 816, 819-20(10th Cir. 2020)(basing decision on the §1B1.13 policy statements, the BOP Program Statement 5050.50, and the §3553(a) statutory sentencing factors); United States v. Hall, No. 5:98-cr-7-JMH, 2019 WL 6829951, at *3-4 (E.D.Ky. Dec. 13, 2019)(for purposes of §1B1.13 Commentary Note 1(D), BOP Director has defined "other reasons" in Program Statement 5050.50); United States v. Crawford, No. 1:07CR317-1, 2019 WL 6615188, at *4-5 (M.D.N.C. Dec. 5, 2019)(applying Commentary Notes (1)(A) and (B) and the BOP Program Statement in denying a reduction based on defendant's medical conditions).

In United States v. Washington, Criminal Action No. 5:13-020-DCR, 2019 WL 6220984, at *1-2 (E.D.Ky. Nov. 21, 2019), reconsideration denied, 2020 WL 1873550 (Apr. 14, 2020), the court declined to follow Cantu and concluded that district courts are not free to grant compassionate release based on any reason they find to be "extraordinary and compelling." That court also noted 28 U.S.C. §994(t), which delegates to the Sentencing Commission the duty to describe what should be considered extraordinary and compelling reasons for a sentence reduction under §3582(c)(1)(A), "including the criteria to be applied and a list of specific examples." 28 U.S.C. §994(t).

III. Defendant's Motion for Compassionate Release

In his motion for compassionate release, defendant cites his medical conditions, specifically primary hypertension and emphysema, which he argues would put him at an increased risk of contracting

7

a serious case of COVID-91. The court has considered the medical records submitted by the parties. None of the medical records show that defendant's medical conditions meet the requirements of Commentary Note 1(A) to §1B1.13. There is no evidence that defendant is suffering from a terminal illness, that is, a serious and advanced illness with an end of life trajectory. There is also no evidence that he is suffering from a serious physical or medical condition, a functional or cognitive impairment, or deteriorating physical or mental health because of the aging process, that substantially diminishes his ability to provide self-care within the environment of a correctional facility and from which he is not expected to recover. The records submitted by the government include a document dated July 26, 2019, which indicated that defendant was found to have no housing or physical limitations or work restrictions. Doc. 64-4, p. 67. The court concludes that defendant's medical conditions, considered alone, do not satisfy any of the grounds for compassionate release set forth in §1B1.13.

    The government acknowledges that if a defendant demonstrates that he has a chronic medical condition that has been identified by the Center for Disease Control ("CDC") as elevating a person's risk of becoming seriously ill from COVID-19, then this chronic condition reasonably might be found to be "serious" and to "substantially diminish the ability of the defendant to provide self-care within the environment of a correctional facility" even if that condition would not have constituted an "extraordinary and compelling reason" absent the risk of COVID-19. See U.S.S.G. §1B1.13, cmt. n. 1(A)(ii). However, the government argues that defendant has failed to make such a showing in this case.

8

Assuming arguendo that this broader interpretation of Commentary Note 1(A)(ii) is permissible, §3582(c)(1)(A), as amended by the First Step Act, "does not constitute a get-out-of-jail card." United States v. Brady, S2 18 Cr. 316 (PAC), 2020 WL 2512100, at *3 (S.D.N.Y. May 15, 2020). Rather, "compassionate release motions amid the COVID-19 pandemic have required a 'fact-intensive' inquiry ... made in the 'unique circumstances' and 'context' of each individual defendant." Id., citing United States v. Shakur, No. 82 CR 312 (CSH), 2020 WL 1911224, at *1 (S.D.N.Y. Apr. 20, 2020) and United States v. Hart, 17 Cr. 248 (VSB), 2020 WL 1989299, at *6 (S.D.N.Y. Apr. 27, 2020)). Factors courts have considered include the defendants age, the severity and documented history of the defendant's health conditions and the defendant's history of managing those conditions in prison, the status of COVID-19 in the institution, the percentage of the term of incarceration that has been served, and the sentencing factors in §3553(a). Id.

Defendant is 48 years old. He has served approximately a year of his 42-month sentence. He is scheduled for early release on home confinement on August 25, 2020. He claims to have hypertension and emphysema. According to the Center for Disease Control, persons who have pulmonary hypertension and certain lung conditions such as emphysema are at increased risk of severe illness from COVID-19, and persons with other forms of hypertension may have an increased risk of severe illness. See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last checked August 3, 2020).

The medical records indicate that defendant has essential (primary) hypertension, and that he takes prescription medication

9

for that condition. See Doc. 64-6, pp. 53, 63 (BOP medical record noting that defendant's current health problems, included primary hypertension). BOP Chronic Care Clinic records dated July 26, 2019, and May 7, 2020, stated that defendant's blood pressure was well controlled with medication. Doc. 64-6, pp. 2-5, 20. Defendant has been able to successfully manage this condition while in prison. There is no evidence that defendant's hypertension would place him at a higher risk of serious illness if he contracts COVID-19.

The only medical test indicative of emphysema is an x-ray report dated July 12, 2017, which stated that defendant's lungs were hyperinflated consistent with clinically significant emphysema, and that the findings were suggestive but not diagnostic of chronic obstructive pulmonary disease. Doc. 65-1, p. 71. However, other x-rays before and after that date showed no signs of cardiopulmonary disease. See Doc. 65-1, p. 18 (March 24, 2014, report of chest x-ray showing clear lungs, unremarkable pulmonary vasculature, and no acute findings); Doc. 65-1, p. 24 (December 15, 2014, report of x-ray showing normal pulmonary vascularity and no acute cardiopulmonary disease); Doc. 64-4, pp. 104-105 (April 2, 2016, report of stable chest x-ray showing no acute lung infiltrate or cardiopulmonary disease, also noting a normal left heart catheterization exam the previous year); Doc. Doc. 64-4, p. 94 (August 22, 2019, report concerning chest x-ray which showed clear lungs and no acute cardiopulmonary disease); Doc. 64-4, pp. 2-5 (May 7, 2020, Chronic Care Clinic record indicating that a chest x-ray was negative, with no mention of emphysema in the assessment section of the report). Although a BOP clinical note dated July 9, 2019, documented defendant's claim of a history of emphysema, see Doc. 64-

10

4, p. 28, defendant did not complain about any symptoms related to emphysema during his visits to the Chronic Care Clinic in 2019 or 2020. The evidence is insufficient to establish that defendant currently suffers from emphysema or its effects, or that the single diagnosis of that condition in the past would be sufficient to indicate a present enhanced risk of serious illness from COVID-19 exposure.

As to the status of COVID-19 at BOP institutions, defendant has cited expert articles and reports which express concern about the BOP's ability to effectively address the spread of COVID-19. Defendant points to evidence indicating that since the filing of his motion, there has been an increase in COVID-19 cases at FCI Edgefield and in BOP institutions in general.

The BOP has taken steps to address the COVID-19 epidemic. The BOP has implemented a modified operation plan. See https://bop.gov/coronavirus/covid19-status.jsp (last checked August 3, 2020). Under this plan, social visits at the institutions are precluded, inmate internal movement has been suspended, staff travel and training has been suspended, enhanced health screening of staff has been implemented, newly arriving inmates are processed through quarantine or jail/detention sites and are screened for COVID, asymptomatic inmates with exposure to risk factors are quarantined, and symptomatic inmates with exposure risk factors are isolated and tested. To date, 7,282 inmates have been placed on home confinement. See https://bop.gov/coronavirus/ (last checked August 4, 2020).

The statistics provided by the BOP indicate that currently there are 128,603 inmates in BOP facilities, 13,721 inmates in

11

community-based facilities, and approximately 36,000 staff. See https://bop.gov/coronavirus (last checked August 4, 2020). To date, 2,374 inmates and 515 staff members have tested positive for COVID-19; 8,273 inmates and 715 staff members have recovered from COVID-19; and there have been 106 inmate deaths (four of those deaths occurred while the inmate was on home confinement) and 1 staff member death. The BOP website reports that at FCI Edgefield, zero inmates previously tested positive for COVID-19 and 1 staff member previously tested positive and recovered. Currently 66 inmates and 22 staff member have tested positive, and there have been no staff or inmate deaths. The BOP website states that this data reflects an increase in the number of cases because the "BOP has begun additional testing of asymptomatic inmates to assist in slowing transmissions within a correctional setting." This indicates that the BOP is now taking additional measures to identify inmates who may have COVID-19 without displaying any symptoms.

The court also notes that the threat of COVID-19 is not limited to the prison population. It has impacted the general population as well. Although defendant has indicated that he would essentially be self-quarantined at his residence while on home confinement, his wife and family members would not be restricted to their residence and could potentially introduce COVID-19 to their home. Volusia County, Florida, where defendant's DeLeon Springs residence is located, has not escaped the COVID-19 epidemic. On August 3, 2020, the Florida Department of Health reported 7,232 cases of COVID-19 and 118 COVID-19-related deaths in Volusia County, and 106 cases of COVID-19 in the DeLeon Springs zip code. See https://floridahealthcovid19.gov COVID-19 Data and Surveillance

Dashboard (last checked August 4, 2020).[2]

Also relevant is the fact that defendant is already scheduled to be released on home confinement on August 25, 2020. Current BOP policy requires that an inmate being released to community custody must be quarantined for 14 days prior to release. See https://bop.gov/coronavirus/covid19_status.jsp (last checked August 3, 2020). Thus, it is common for courts granting motions for compassionate release to stay the execution of the order for fourteen days or longer to permit this quarantine period to run, thereby ensuring the inmate's safe release, and to give the BOP adequate time to make travel and other arrangements which will facilitate the inmate's release and transition to home confinement, including participation in substance abuse treatment and location monitoring. See, e.g., United States v. Burnside, No. 18-CR-2068-CJW-MAR, 2020 WL 3443944, at *11 (N.D. Iowa June 18, 2020)(staying execution of release order for 28 days to allow the BOP and the United States Probation Office time to make necessary arrangements for the defendant's release). The BOP has recommended drug counseling and treatment and assistance in obtaining employment in defendant's case. See Doc. 64-2 at pp. 1-2. In light of the fact that defendant is scheduled to be released in any event in three weeks, the court is reluctant to interfere with the BOP's planned arrangements for the defendant by ordering his immediate release.

---

[2]This court can take judicial notice of the records of state agencies. See Disabled Rights Action Committee v. Las Vegas Events, Inc., 375 F.3d 861, 866 n. 1 (9th Cir. 2004)(citing Kottle v. Northwest Kidney Centers, 146 F.3d 1056, 1064 n. 7 (9th Cir. 1988)(state health department records were properly judicially noticed)).

V. Conclusion

Considering all of the above circumstances, including the potential impact of COVID-19, the court concludes that defendant has not shown that extraordinary and compelling reasons for compassionate release exist in his case. Therefore, the court need not address the statutory sentencing factors. Defendant's emergency motion for a reduction in sentence (Doc. 61) is denied.

Date: August 4, 2020         s/James L. Graham
                             James L. Graham
                             United States District Judge